# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LPPAS REPRESENTATIVE, LLC, in its capacity as authorized agent and representative of Luis Perez, Gerardo Necuze, and Manuel Enriquez, <br><br> Plaintiff, <br><br> v. <br><br> ATH HOLDING COMPANY, LLC, and HIGHLAND ACQUISITION HOLDINGS, LLC, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 2020-0241-KSJM |
| SHAREHOLDER REPRESENTATIVE SERVICES LLC, solely in its capacity as HealthSun Sellers' Representative, <br><br> Plaintiff/Counterclaim Defendant, <br><br> v. <br><br> ATH HOLDING COMPANY, LLC and HIGHLAND ACQUISITION HOLDINGS, LLC, <br><br> Defendants/Counterclaim Plaintiffs. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 2020-0443-KSJM |

## MEMORANDUM OPINION

Date Submitted: November 10, 2020
Date Decided: December 29, 2020

Matthew P. Denn, Kelly L. Freund, DLA PIPER LLP, Wilmington, Delaware; *Counsel for Plaintiff LPPAS Representative, LLC.*

A. Thompson Bayliss, E. Wade Houston, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Counsel for Plaintiff and Counterclaim Defendant Shareholder Representative Services LLC.*

Kevin M. Coen, Sara Toscano, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Glenn M. Kurtz, WHITE & CASE LLP, New York, New York; *Counsel for Defendants and Counterclaim Plaintiffs ATH Holding Company, LLC and Highland Acquisition Holdings LLC.*

**McCORMICK, V.C.**

Two groups of owners, the "Pasteur" and "HealthSun" owners, sold their medical care and insurance companies as part of a package deal pursuant to a purchase agreement. The sellers agreed to have $100 million of consideration placed in escrow as security for the buyer's claims for indemnification. The escrow funds were to be gradually released over four years. This decision addresses disputes concerning the 2019 release, which was to be in the amount of around $13 million minus any pending indemnification claims.

The purchase agreement permits indemnification for material misstatements or inaccuracies in the representations and warranties and states that claims totaling $14.675 million in the aggregate shall be deemed material. By early November 2019, the buyer's successor, ATH Holding Company, LLC ("Anthem"), had asserted two indemnification claims totaling less than the materiality standard. Anthem then made a third indemnification claim estimating loss that it said "could well exceed" the materiality standard. The justification for the third claim was that all Anthem subsidiaries, including the Pasteur and HealthSun entities, were subject to an investigation by the Department of Justice (the "DOJ") into claims similar to those that had resulted in a nine-figure settlement between the DOJ and an unaffiliated entity.

In March 2020, the DOJ filed a lawsuit against Anthem but did not name the Pasteur or HealthSun entities as defendants. Although this development eliminated

the risk of loss on which Anthem based its third indemnification claim, Anthem refused to instruct the escrow agent to release any of the funds that were earmarked for the 2019 release. Anthem then served a fourth indemnification claim for approximately $174 million in losses.

Representatives of the Pasteur and HealthSun sellers filed separate lawsuits to obtain the funds subject to the 2019 release. They claimed that those funds should have been released once the basis for the third indemnification claim evaporated and the aggregate amount of the remaining timely claims dropped below the materiality standard. The Pasteur sellers moved for summary judgment. The HealthSun sellers moved for judgment on the pleadings. This decision resolves both motions.

To justify its actions, Anthem argues that the fourth indemnification claim relates back to the first and thus applies retroactively to block distribution of the disputed funds. Anthem alternatively argues that the materiality standard does not limit Anthem's ability to make claims against the escrow funds; rather, it only affects Anthem's ability to ultimately obtain indemnification. This decision rejects both of these arguments, thus requiring the court to wrestle with the meaning of the materiality standard on which the sellers rely. Both Anthem and the sellers offer reasonable interpretations of the materiality standard, rendering the provision ambiguous and judgment as a matter of law inappropriate. The motions as to that issue are denied.

2

## I.     FACTUAL BACKGROUND

The background is drawn from the undisputed facts.

### A.     The Purchase Agreement and the Escrow Agreement

This case arises from an Equity Interests Purchase Agreement (the "Purchase Agreement").[1]   Under the Purchase Agreement, Defendant Highland Acquisition Holdings, LLC (the "Buyer") acquired two groups of Florida-based entities (the "Pasteur Entities" and the "HealthSun Entities," and together, the "Entities") from their respective owners (the "Pasteur Sellers" and the "HealthSun Sellers," and, together, the "Sellers").   The Entities operate as an integrated health plan, medical center network, and pharmacy.[2]

Highland's acquisition of the Entities closed in November 2016.[3]   Anthem bought Highland in 2017 and now owns the Entities.[4]

The Purchase Agreement requires the Sellers to indemnify the Buyer and its successors for any "Losses" arising from breaches or inaccuracies in the Sellers'

---

[1] C.A. No. 2020-0241-KSJM (the "Pasteur Action") Docket ("Dkt.") 9, Transmittal Aff. of Kelly L. Freund, Esq. in Supp. of Pl.'s Mot. for Summ. J. Ex. A (Purchase Agreement); C.A. No. 2020-0443-KSJM (the "HealthSun Action") Dkt. 1, Verified Compl. for Specific Performance ("HealthSun Compl.") ¶ 9 & Ex. 1 (Purchase Agreement); HealthSun Action Dkt. 18, Defs. ATH Holding Company, LLC and Highland Acquisition Holdings, LLC's Answer to Pl.'s Verified Compl. and Verified Countercls. ("HealthSun Answer") ¶ 9.

[2] Purchase Agreement Recitals at 2; *see also* Pasteur Action Dkt. 28, Decl. of Stephen J. Schlegel Pursuant to 10 *Del. C.* § 3927 in Supp. of Defs.' Br. in Opp'n to Pl.'s Mot. for Partial Summ. J. ("Schlegel Decl.") ¶ 3; HealthSun Answer ¶¶ 25–30.

[3] Schlegel Decl. ¶ 2; HealthSun Compl. ¶ 10; HealthSun Answer ¶ 10.

[4] Schlegel Decl. ¶ 4; HealthSun Answer n.1.

3

representations or warranties.[5]  All of the representations and warranties at issue in these lawsuits are classified in the Purchase Agreement as "Specified Health Care Representations and Warranties" (the "Specified Representations"), under which the Sellers represented that the Entities had complied in all material respects with certain healthcare laws.[6]

For the purpose of securing the Sellers' indemnification obligations under the Purchase Agreement, Highland deposited $100 million of the purchase price into escrow.[7]  That amount served as a cap on indemnification claims arising from breaches or inaccuracies in the Specified Representations.[8]

The parties agreed that the escrowed funds would be released as governed by a November 30, 2016 Escrow Agreement (the "Escrow Agreement").[9]  The Purchase

---

[5] Purchase Agreement § 10.3(a).

[6] *Id.* § 10.2(a); *see also id.* §§ 2.13(e), (g), (h), (i), (l), (m).  The Purchase agreement defines "Health Care Representations and Warranties" as the representations and warranties "set forth in Sections 2.13(e) through 2.13(m)." *Id.* at A-8 (emphasis omitted).  The Specified Representations, as defined in Section 10.2(a), are the representations and warranties "set forth in Sections 2.13(e), 2.13(g), 2.13(h), 2.13(i), 2.13(l), 2.13(m) solely with respect to" certain regulatory compliance claims. *Id*. § 10.2(a) (emphasis omitted).

[7] Purchase Agreement § 1.3(d)(i).

[8] *Id.* § 10.2(c).

[9] *Id.* § 1.3(d); *see also* Freund Aff. Ex. B (Escrow Agreement); HealthSun Compl. ¶ 10 & Ex. 2 (Escrow Agreement); HealthSun Answer ¶ 10.

4

Agreement required that the parties enter into the Escrow Agreement, attached the Escrow Agreement as an exhibit, and incorporated it by reference.[10]

The Purchase Agreement and the Escrow Agreement set out a complicated contractual scheme, and the specific provisions germane to the parties' dispute are quoted and discussed in the below analysis. This section calls out a few of the provisions to set the stage for the parties' dispute.

First, Section 10.2(a) of the Purchase Agreement ("Section 10.2(a)") establishes limitations on indemnification and contains a materiality standard, which provides with respect to the Specified Representations that "if and after the cumulative amount of Losses sustained, . . . equals or exceeds $14,675,000 in the aggregate, then . . . all such Losses shall be deemed to have satisfied . . . the terms 'material,' . . . and similar words set forth in any [Specified Representations]."[11]

Second, Section 10.5 of the Purchase Agreement provides for notice of claims for indemnification. Specifically, "[a]fter becoming aware of a claim for indemnification," a party seeking indemnification "may give notice . . . of such claim and, if known, the amount the Indemnified Person believes it is entitled to receive."[12]

---

[10] *See* Purchase Agreement Recitals at 3 (stating that the Purchase Agreement is contingent on the parties entering into the Escrow Agreement); *id.* § 11.16 (incorporating the recitals as material provisions); *id.* § 11.13 (incorporating all schedules and exhibits by reference); *id.* at A-19 (adopting the Escrow Agreement as a Related Agreement).

[11] *Id.* § 10.2(a).

[12] *Id.* § 10.5.

Third, Section 4 of the Escrow Agreement ("Section 4") requires the appointed escrow agent (the "Escrow Agent") to hold back any disputed amounts upon the buyer's timely service of a properly noticed escrow claim. To notice an escrow claim, Section 4 provides that the "Buyer may deliver . . . written notices . . . stating that it has made a claim for indemnification . . . and specifying the amount of the Loss if known, and, if not known, Buyer's reasonable good faith estimate of the amount of the Loss . . . and stating in reasonable detail the nature of, and basis for, any such Claim."[13]

Finally, Section 6 of the Escrow Agreement provides that the escrowed funds were to be "automatically" released on the business day following each anniversary of the Escrow Agreement over four years.[14] The releases were to be in specified amounts minus any indemnification claims then "pending" as follows:

- "On [December 1, 2017], an amount equal to the amount (if any) by which . . . the . . . Escrow Fund less the aggregate Claim Amounts which are pending as of [November 30, 2017] exceeds . . . $66,500,000 . . . shall be automatically released and distributed by the Escrow Agent . . . [,]"[15]

- "On [December 3, 2018], an amount equal to the amount (if any) by which . . . the . . . Escrow Fund less the aggregate Claim Amounts which are pending as of [November 30, 2018] exceeds . . . $33,000,000 . . .

---

[13] Escrow Agreement § 4.

[14] *See id.* §§ 6(a)–(d).

[15] *Id.* § 6(a).

6

shall be automatically released and distributed by the Escrow Agent . . . [,]"[16]

- "On [December 2, 2019], an amount equal to the amount (if any) by which . . . the . . . Escrow Fund less the aggregate Claim Amounts which are pending as of [November 30, 2019] exceeds . . . $20,000,000 . . . shall be automatically released and distributed by the Escrow Agent . . . [,]"[17]

- "On [December 1, 2020], any . . . remaining . . . Escrow Fund less the amount of any Claims which are pending as of [November 30, 2020] . . . shall be automatically released and distributed by the Escrow Agent . . . ."[18]

The pending motions concern the release scheduled for December 2, 2019 release (the "2019 Release") of funds in the amount of up to $13 million minus pending indemnification claims (the "Disputed Funds").

### B. Anthem Asserts Three Indemnification Claims Prior to the 2019 Release.

In the twelve months prior to the 2019 Release, Anthem provided the Sellers with notice of three claims for indemnification as to losses for breaches or inaccuracies in the Specified Representations.

---

[16] *Id.* § 6(b).

[17] *Id.* § 6(c).

[18] *Id.* § 6(d).

7

Anthem made the first claim in the amount of $5 million on June 28, 2019,[19] and the second claim in the amount of $800 thousand on November 1, 2019.[20] The combined total of the first two indemnification claim amounts falls under the $14.675 million materiality threshold, and the plaintiffs do not dispute the contents of those claims or corresponding notices for the purpose of the pending motions. The third indemnification claim and notice are in dispute.

The third claim, which was also provided on November 1, 2019,[21] asserts losses in connection with Civil Investigation Demands (the "CIDs") that Anthem received from the DOJ regarding a then-ongoing investigation of allegedly false reporting of coding errors (the "DOJ Investigation"). The notice states that "the amount of Loss is currently unknown" but concluded that the Loss "could well exceed the materiality standard ($14,675,000)."[22]

The only support Anthem offered in the third indemnification notice for its position that an indemnifiable claim could reasonably be expected to result was the

---

[19] Pasteur Action Dkt. 28, Transmittal Decl. of Sara Toscano Pursuant to 10 *Del. C.* § 3927 in Supp. of Defs.' Opp'n Br. to Pl.'s Mot. for Partial Summ. J. ("Toscano Decl.") Ex. 13 ("First Indemnification Notice"); HealthSun Compl. ¶ 104 & Ex. 21 (First Indemnification Notice); HealthSun Answer ¶ 104.

[20] Toscano Decl. Ex. 15 ("Second Indemnification Notice"); HealthSun Compl. ¶ 113 & Ex. 24 (Second Indemnification Notice); HealthSun Answer ¶ 113.

[21] Toscano Decl. Ex. 19 ("Third Indemnification Notice"); HealthSun Compl. ¶ 120 & Ex. 25 (Third Indemnification Notice); HealthSun Answer ¶ 120.

[22] *Id.* at 1.

definition of "[t]he terms 'You,' 'Your,' 'Anthem,' and 'Anthem's'" in the CID. Anthem construed those terms literally to include all of its subsidiaries, even those acquired after the DOJ Investigation began, such as the Entities.[23]

Anthem noticed a claim against the escrow funds in connection with these three indemnification claims on November 25, 2019, instructing that the Escrow Agent not release any amount of the Disputed Funds.[24] The Sellers sent letters disputing the escrow claim, and the Escrow Agent withheld the Disputed Funds.

### C. Subsequent Events Eliminate the Basis for Anthem's Third Indemnification Claim.

The DOJ Investigation culminated in the DOJ filing a complaint in the United States District Court for the Southern District of New York against Anthem for violations of the False Claims Act on March 26, 2020.[25] The complaint did not name the Entities as parties. This development eliminated the basis for Anthem's third indemnification claim. Anthem no longer seeks indemnification from the Sellers based on the third indemnification claim.[26]

---

[23] *Id.*

[24] Toscano Decl. Ex. 20 ("Escrow Notice"); HealthSun Compl. ¶ 135 & Ex. 28 (Escrow Notice); HealthSun Answer ¶ 135.

[25] Freund Aff. Ex. I; HealthSun Compl. ¶ 144; HealthSun Answer ¶ 144.

[26] *See* Pasteur Action Dkt. 27, Defs. ATH Holding Company, LLC and Highland Acquisition Holdings, LLC's Opp'n to Pl.'s Mot. for Partial Summ. J. ("Pasteur Defs.' Ans. Br.") at 26; HealthSun Action Dkt. 43, Defs. ATH Holding Company, LLC and Highland Acquisition Holdings, LLC's Opp'n to Shareholder Representative Services

9

### D. The Pasteur Plaintiff Files Litigation.

The Pasteur Plaintiff filed suit against Highland and Anthem (together, "Defendants") on March 31, 2020, seeking release of the Disputed Funds.[27] The Pasteur Complaint asserts three causes of action. In Counts I and II, the Pasteur Plaintiff claims that Defendants breached the Purchase Agreement and the Escrow Agreement by withholding the Disputed Funds. The Pasteur Plaintiff brings Count I for specific performance and Count II for declaratory relief. In Count III, the Pasteur Plaintiff seeks indemnification under the Purchase Agreement for costs and expenses, including attorneys' fees, incurred in connection with this litigation.

### E. Anthem Asserts a New Indemnification Claim.

On April 16, 2020, Anthem sent the Sellers notice of an additional indemnification claim.[28] This fourth indemnification claim and notice purported to "relate[] back to the Claim Notice Anthem made in June 2019" for $5 million.[29]

---

LLC's Mot. for J. on the Pleadings and Mot. to Dismiss ("HealthSun Defs.' Ans. Br.") at 21.

[27] Pasteur Compl. The Purchase Agreement designates Plaintiff LPPAS Representative, LLC (the "Pasteur Plaintiff") as the Pasteur Sellers' representative and empowers the Pasteur Plaintiff to represent the Pasteur Sellers with respect to all claims arising under the Purchase Agreement and Escrow Agreement. Purchase Agreement § 8.2(a).

[28] Toscano Decl. Ex. 12 ("Fourth Indemnification Claim"); *id.* Exs. 1, 9, 10, 22 (attachments to the Fourth Indemnification Claim); HealthSun Compl. ¶ 152 & Ex. 37 (Fourth Indemnification Claim); HealthSun Answer ¶ 152. Pincites to the attachments to the Fourth Indemnification Claim are to the version of that document attached as Exhibit 37 to the HealthSun Complaint.

[29] Fourth Indemnification Claim at 1 n.1.

The fourth notice is more detailed than the initial three. It states that, in February 2019, Anthem received a whistleblower report from a terminated employee.[30] The report alleged fraudulent and improper coding practices by the Pasteur Entities.[31] The report prompted Anthem to conduct an internal investigation, which supposedly unearthed wrongdoing in the Entities' code reporting that predated Highland's acquisition of the Entities.[32] The notice provided both anecdotal evidence of improper diagnosis coding and documentary evidence of the conduct to which it referred.[33]

Anthem claimed that improper coding erroneously inflated the Entities' 2017 EBITDA, which was used to generate the purchase price it paid.[34] Because it estimated that the identified practices inflated the Entities' 2017 EBITDA by $10.01 million, and because the Entities' 2017 EBITDA was multiplied by 14.5 to calculate the purchase price, Anthem's notice claimed damages of $145.145 million.[35] Together with the damages it estimated to incur from correcting

---

[30] *Id.* at 2.

[31] *Id.* 2–3.

[32] *Id.* at 1.

[33] *Id.* at 3–4, 10–29.

[34] *Id.* at 7.

[35] *Id.*

the coding errors, Anthem's notice asserted total losses up to $173.645 million arising out of the breaches of the Specified Representations.[36]

## F.    The HealthSun Plaintiff Files Litigation.

The HealthSun Plaintiff filed suit against Defendants on June 5, 2020, also seeking release of the Disputed Funds.[37]  The HealthSun Complaint asserts two causes of action that align with Counts I and III of the Pasteur Complaint.  In Count I, the HealthSun Plaintiff claims that Defendants breached the Purchase Agreement and the Escrow Agreement by withholding the Disputed Funds.  In Count II, the HealthSun Plaintiff seeks indemnification under the Purchase Agreement for costs and expenses, including attorneys' fees, incurred in connection with this litigation.

Defendants answered the HealthSun Complaint on July 24, 2020, asserting two counterclaims.  Both counterclaims seek to enforce Anthem's right to indemnification for breaches of the Specified Representations.  In the first counterclaim, Anthem seeks indemnification for coding misconduct as outlined in

---

[36] *Id.*

[37] HealthSun Compl. The Escrow Agreement designates Plaintiff Shareholder Representative Services LLC (the "HealthSun Plaintiff") as the HealthSun Sellers' representative and empowers the HealthSun Plaintiff to represent the HealthSun Sellers with respect to all claims arising under the Purchase Agreement and Escrow Agreement. Escrow Agreement Recitals at 1; *see also* HealthSun Answer ¶ 7 (admitting the HealthSun Plaintiff's assertion that it represents the HealthSun Sellers).

its first and fourth claim letters.  In the second counterclaim, Anthem seeks the same relief regarding its second notice.[38]

## II.    LEGAL ANALYSIS

The Pasteur Plaintiff and the HealthSun Plaintiff (together, "Plaintiffs") each seek specific performance of the Escrow Agreement requiring Anthem to stipulate to the release of the Disputed Funds.  They also seek their costs, including their attorneys' fees, in connection with success on their claims for specific performance.  On their respective claims for specific performance and contractual fee-shifting, the Pasteur Plaintiff has moved for partial summary judgment and the HealthSun Plaintiff has moved for judgment on the pleadings.

Although Plaintiffs chose different procedural vehicles, they both seek relief based on purportedly unambiguous contractual language and undisputed facts and events.  In this scenario, the different procedural vehicles do not require different analyses and the motions can be resolved together.

Rule 56 and Rule 12(c) each allow for judgment in the movant's favor when there are no material factual disputes and the moving party is entitled to a judgment

---

[38] The HealthSun Plaintiff has also moved to dismiss Defendants' counterclaims.  *See* HealthSun Action Dkt. 27, Pl.'s Mot. to Dismiss Countercls.  This decision deals only with the motions concerning the Plaintiffs' claims and not the HealthSun Plaintiff's motion concerning Defendants' counterclaims, which will be addressed separately.

13

as a matter of law.[39] Summary judgment and judgment on the pleadings are both appropriate vehicles for resolving disputes over unambiguous contractual language.[40] Typically neither are appropriate vehicles for resolving disputes over the meaning of ambiguous contractual terms, because rarely are the material facts concerning the meaning of ambiguous contractual terms undisputed.[41]

---

[39] *Compare* Ct. Ch. R. 56(c), *and United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997) (holding that summary judgment is appropriate when, "after viewing the facts in the light most favorable to the nonmoving party, the moving party has demonstrated that no material issues of fact are in dispute and it is entitled to judgment as a matter of law"), *with* Ct. Ch. R. 12(c), *and Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 1456494, at *4 (Del. Ch. Nov. 5, 2001) (holding that, when considering a motion for judgment on the pleadings, "the Court must accept well-pleaded facts in the Complaint as admitted" and may grant the motion "only where the movant is entitled to judgment as a matter of law and there are no disputed material facts").

[40] *See XO Commc'ns, LLV v. Level 3 Commc'ns, Inc.*, 948 A.2d 1111, 1124 (Del. Ch. 2007) ("Summary judgment is particularly appropriate in a dispute over an unambiguous contract 'because there is no need to resolve material disputes of fact.'" (quoting *NBC Universal, Inc. v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005))); *Banks v. Banks*, 135 A.3d 311, 316 (Del. Ch. 2016) ("A judgment on the pleadings 'is a proper framework for enforcing unambiguous contracts,' like those before the Court here, because there is 'no need to resolve material disputes of fact.'" (quoting *OSI Sys., Inc. v. Instrumentarium Corp.*, 892 A.2d 1086, 1090 (Del. Ch. 2006) and *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Hldgs. Pvt. Ltd.,* 2013 WL 5787958, at *3 (Del. Ch. Oct. 25, 2013))).

[41] *See GMG Cap. Invs., LLC v. Athenian Venture P'rs. I, L.P.*, 36 A.3d 776, 784 (Del. 2012) (reaffirming that, "in a dispute over the proper interpretation of a contract, summary judgment may not be awarded if the language is ambiguous and the moving party has failed to offer uncontested evidence as to the proper interpretation"); *ITG Brands, LLC v. Reynolds Am., Inc.*, 2019 WL 4593495, at *9 (Del. Ch. Sept. 23, 2019) ("When a contractual provision is ambiguous, judgment on the pleadings is not appropriate to resolve the ambiguity.").

Ambiguity is determined by the court as a matter of law.[42] Contractual language is ambiguous only when "the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[43]

## A. Claim for Specific Performance

Plaintiffs seek specific performance of the Escrow Agreement requiring Anthem to stipulate to the release of the Disputed Funds. The thrust of Plaintiffs' claims is that Section 10.2(a) requires Anthem to meet a $14.675 million "materiality threshold" in order to block the release of the Disputed Funds but that Anthem fell below that threshold when the third indemnification claim became defunct.

Resolution of this claim rides on three issues. First, should the fourth indemnification claim relate back to a timely filed claim so as to bring the cumulative losses up to the $14.675 million materiality standard and justify continued withholding of the Disputed Funds? Second, does the materiality standard of Section 10.2(a) limit Anthem's ability to notice claims against escrow or only limit Anthem's ability to ultimately obtain indemnification? Third, if the first two issues go against Anthem—the fourth indemnification claim does not relate back and

---

[42] *Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1030 (Del. Ch. 2008) ("The 'determination of whether a contract is ambiguous is a question for the court to resolve as a matter of law.'" (quoting *NBC Universal*, 2005 WL 1038997, at *5)).

[43] *NBC Universal*, 2005 WL 1038997, at *5 (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)).

15

Anthem must meet the limitations of Section 10.2(a) in order to block the release of escrow funds—what does the materiality standard of Section 10.2(a) mean? Does it impose a materiality threshold requiring Anthem to accumulate $14.675 million in losses in order to block the release of escrow funds?

### 1. The fourth indemnification claim does not relate back to the first indemnification claim.

Anthem disputes Plaintiffs' interpretation of Section 10.2(a) but argues that Plaintiffs' interpretation makes no difference because Anthem has met Section 10.2(a)'s materiality threshold if it imposes one.[44]

Anthem has withdrawn reliance on the third indemnification claim and acknowledges that the fourth indemnification claim was not pending as of the 2019 Release date. Anthem nevertheless argues that it should be deemed to have claims for over $14.675 million in losses pending by the 2019 Release because the fourth indemnification claim "relates back" to the first.

To make this argument, Anthem appeals by analogy to the relation-back standard by which a court determines whether an amended pleading relates back to an earlier filing.[45] Claims relate back under this standard where they "arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the

---

[44] *See* Pasteur Defs.' Ans. Br. at 32–33.

[45] HealthSun Defs.' Ans. Br. at 33–34.

original pleading."[46]  In determining whether an amended pleading should relate back, courts also consider whether a defendant "should have had notice from the original pleadings that the plaintiff's new claim might be asserted against him."[47] Applying this standard, Anthem argues that its fourth indemnification claim relates back to its first because it pertains to "a common core of operative facts,"[48] and because the Sellers had sufficient notice of the claim given the presumption that the "Sellers already know the details of the conduct at issue."[49]

Anthem's relation-back argument runs contrary to the parties' contractual scheme.  The Escrow Agreement does not allow Anthem to make a claim against the escrow funds after the date on which the funds are due to be automatically released, which is basically what Anthem attempts to do through its relation-back

---

[46] *Agspring Holdco, LLC v. NGP X US Hldgs, L.P.*, 2020 WL 4355555, at *11 (Del. Ch. July 30, 2020).

[47] *Atlantis Plastics Corp. v. Sammons*, 558 A.2d 1062, 1065 (Del. 1989).

[48] HealthSun Defs.' Ans. Br. at 33.

[49] *Id.* at 50 ("Failing to further describe to Plaintiff its own conduct, which it already knows, cannot be material or a basis for ordering the release of the escrow." (citing *Framingham Sav. Bank v. Turk*, 1994 Mass. App. Div. 207, 208 (Mass. App. Ct. 1994) ("The defendants cannot seriously suggest that they were in any way prejudiced by the failure to receive formal written notice of that which was already known to them."))).  *Framingham*, however, merely stands for the proposition that a deficiency action against a mortgagor is not time-barred due to failure to provide written notice where the mortgagor had "actual notice of the mortgagee's *intention to pursue* a deficiency."  *See Framingham*, 1994 Mass. App. Div. at 207 (emphasis added).  It does not support Defendants' argument that simply because the Sellers may have been aware of coding misconduct they had notice that Anthem would seek indemnification for that misconduct.  *See* HealthSun Defs.' Ans. Br. at 50 ("Plaintiff and the 2016 Sellers already know the details of the conduct at issue.  The Companies were the parties engaged in the Coding Misconduct.").

argument. Section 4 establishes the process by which Anthem may submit a "Claim Notice" to freeze the escrow funds. That process permits Anthem to submit a Claim Notice only after a "*timely* claim for indemnification" had been submitted, and for good reason.[50] After a Claim Notice has been properly submitted, the Escrow Agent applies a purely mathematical formula set forth in the Escrow Agreement for distributing the funds.[51] The formula requires the Escrow Agent to "automatically" release a fixed amount of funds minus the amount of losses set forth in the indemnification claims pending as of the release date. It would not make sense to allow a party to retroactively increase the amount of losses set forth in a notice. To put it mildly, such a provision would severely complicate the Escrow Agent's job.[52]

---

[50] Escrow Agreement § 4 (emphasis added).

[51] *See id.* §§ 6(a)–(c).

[52] *See Impact Invs. Colo. II, LLC v. Impact Hldg. Inc.*, 2012 WL 3792993, at *10 (Del. Ch. Aug. 31, 2012) (rejecting an interpretation of an escrow claim notice provision in a stock purchase agreement that would allow the buyer to amend a deficient notice after a deadline because it would "make it impossible for the Escrow Agent to determine which claims were still pending, and would render Section 5 meaningless").

      To this point, Anthem says that permitting the fourth claim to relate back here poses no complications because the Disputed Funds were never released. This, of course, begs the question: *Should* the funds have been released before Anthem noticed the fourth indemnification claim? The court need not assess whether the third indemnification claim was valid when served because Anthem concedes that it now lacks a basis. Once the basis for withholding evaporated, the funds should have been released. Anthem correctly observes that the governing agreements imposed no express duty requiring Anthem to update its escrow notice so as to release funds withheld on stale claims. But the agreements need not expressly state that Anthem cannot continue to deploy a defunct indemnification claim for a holdover effect after acknowledging that it is groundless, as such a provision would be "obvious and provocative." *See Dieckman v. Regency GP LP* 155 A.3d 358, 368 (Del. 2017) (finding implied in a limited partnership agreement "a requirement that the

18

Anthem's relation-back argument also runs contrary to decisions of this court holding that indemnitees may not assert "placeholder" claims against escrow funds for which details are provided only after the due date for those claims have expired. In *Winshall v. Viacom International, Inc.*, for example, a purchaser made three timely but ultimately unsuccessful indemnification claims and attempted to make a fourth claim after the notice deadline had passed.[53] The purchaser argued that its earlier notices had "reserved its rights to 'seek indemnification for any other claims or matters . . . by other third parties.'"[54] The court held that allowing the purchaser to ignore the contractual deadline and make late claims against the escrow "would constitute a unilateral rewriting of the contract and is impermissible."[55] In this case, allowing Anthem to ignore the contractual deadline and retroactively amend its first

---

General Partner not act to undermine the protections afforded unitholders" where such "terms are easily implied because 'the parties must have intended them and have only failed to express them because they are too obvious to need expression'" (quoting *Danby v. Osteopathic Hosp. Ass'n of Del.*, 101 A.2d 308, 313–14 (Del. Ch. 1953), *aff'd*, 104 A.2d 903 (Del. 1954))).

[53] 2012 WL 6200271, at *3 (Del. Ch. Dec. 12, 2012), *aff'd*, 76 A.3d 808 (Del. 2013).

[54] *Id.* at *8.

[55] *Id.*; *see also Prairie Cap., III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 66 (Del. Ch. 2015) (forbidding buyer from seeking contractual indemnification for acts that pre-date the time range for which it had submitted a timely indemnification claim); *I/Mx Info. Mgmt Sols., Inc. v. Multiplan, Inc.*, 2014 WL 1255944, at *13 (Del. Ch. Mar. 27, 2014) (rejecting broad interpretation of "claim" that would have allowed for indemnification as to facts not specifically mentioned in timely claims on the ground that it would violate *Winshall*'s prohibition on placeholder language).

indemnification claim would similarly constitute a unilateral rewriting of the parties' contractual scheme.

Assuming for the sake of argument that a relation-back standard should be applied in this context, the fourth indemnification claim does not relate back to the first because the fourth is based on new facts and legal theories that were not asserted prior to the 2019 Release date.

Anthem sent the first indemnification claim on June 28, 2019, after Anthem had received the whistleblower report. The text of the letter is two pages long. It does not mention the whistleblower report. Instead, the letter states that Anthem had "recently become aware that in December 2016, [HealthSun] commenced an audit of various entities [sic] Medicare Risk Adjustment (MRA) scoring" and that "[d]uring the audit, . . . HealthSun's coding team found codes/scores that were not supported by the medical charts (the "Scoring Issues")."[56] The letter set out an estimated loss of approximately $5 million. Anthem included a chart detailing the basis for the claimed loss and further identified the portions of the Purchase Agreement that the Sellers' allegedly breached.[57]

Anthem sent the fourth indemnification claim on April 16, 2020. The text of the letter contains over 20 pages of anecdotal and documentary evidence detailing

_____

[56] First Indemnification Claim at 1.

[57] *Id.* at 1–3.

20

an internal investigation into the February 2019 whistleblower report concerning coding fraud at the Pasteur Entities. The fourth indemnification claim estimated a jaw-dropping $173.645 million in losses.[58]

Although it is technically true that both the first and fourth indemnification claims arose from coding issues and an alleged failure to comply with regulatory guidelines, the mistakes identified by the audit of the HealthSun Entities that were charted in the first claim do not relate to the wide-spread fraud alleged against the Pasteur Entities that was the subject of the fourth claim. The claims do not arise from a common core of operative facts, and they involve different theories for valuing those alleged losses, such that the first notice could not have alerted Sellers as to the details of the fourth.

---

[58] Fourth Indemnification Claim at 7. The $173.645 million in estimated losses derives from a combination of two new theories. First, Anthem reports that the internal investigation revealed 11,400 instances where a diagnosis code was inaccurate. *Id.* at 6. Anthem then assumes that every one of those codes would need to be deleted and has an average value of $2,500, resulting in an estimated loss of $28.5 million. *Id.* Second, Anthem claims that unspecified combination of the "Scoring Issues" referenced in the first indemnification claim and other newly alleged coding issues referred to in the fourth indemnification claim affected Anthem's assessment of the value of the Pasteur Entities when it purchased Highland. *Id.* at 6–7. Anthem states the purchase price represented an implied EBITDA multiple of 14.5, but that the Entities' EBITDA was overstated by over $10 million due to the coding errors. *Id.* Thus Anthem estimates a loss from its overpayment of approximately $145 million ($10 million multiplied by 14.5). *Id.* at 7. Although the theory is supposedly based in part on Scoring Issues identified in the first indemnification claim, Anthem did not estimate losses based on the EBITDA multiple implied by the purchase price paid to Highland in the first claim. Together, the first and second theories result in almost $174 million in estimated losses. *Id.*

In an attempt to bolster its relation-back argument, Anthem contends that ordering the distribution of the Disputed Funds at this stage would be inequitable because Anthem *now* has open claims which exceed the materiality threshold and the amount in escrow. But there is nothing inequitable in enforcing Anthem's contractual bargain. Anthem peppers its papers with other variations of its appeal to equitable principles. In short form, those arguments fail as follows:

- Anthem cites to the recitals of the Escrow Agreement stating that its purpose is "to protect Buyer" and argues that "the essence of the Escrow Agreement is to hold the amounts in escrow to fund . . . indemnification."[59] But the court cannot invent provisions "to protect Buyer" based merely on the supposed "essence" distilled from three words in the recitals.[60] Rather, the buyer is limited to the protections for which it negotiated, and those protections were "subject to the limitations" contained in the Escrow Agreement and Purchase Agreement.[61]

- Anthem states that granting specific performance "would effect a forfeiture" because the escrow funds are Anthem's "only recourse" against the Sellers.[62] But, again, the Buyer agreed to cap its recourse to the escrow funds, and further agreed that such funds would shrink over time.[63] The Buyer assumed that risk, as did Anthem when it acquired the Buyer.[64] Therefore, if Anthem's claims fail to comply with

---

[59] HealthSun Defs.' Ans. Br. at 49.

[60] *See Llamas v. Titus*, 2019 WL 2505374, at *16 (Del. Ch. June 18, 2019) (explaining that recitals provide background but generally lack substantive effect and that when recitals are inconsistent with the operative language of a contract, the operative language is controlling).

[61] Escrow Agreement Recitals at 1.

[62] HealthSun Defs.' Ans. Br. at 40.

[63] *See* Purchase Agreement § 10.2(c); Escrow Agreement §§ 6(a)–(d).

[64] *See Restatement (Second) of Contracts* § 227(1) & cmt. b (Am. L. Inst. 1981) (interpreting contracts to avoid the risk that non-occurrence of a condition results in

the materiality standard of Section 10.2(a), specific performance would be appropriate and not a forfeiture.

- Anthem argues that any breaches of the Escrow Agreement are "immaterial" and that Anthem substantially complied with its terms.[65] But this assertion is suspect, and, if Anthem fails to meet the Section 10.2(a) materiality standard, its legal arguments would not allow Anthem to continue to block the 2019 Release in any event.[66]

- Anthem argues that the Sellers had actual notice of the conduct at issue in the fourth indemnification claim thereby excusing Anthem's failure to supply timely notice in compliance with the Escrow Agreement.[67] But if taken to its logical extreme, this argument would effectively render the notice provisions of the Purchase Agreement and Escrow Agreement unenforceable because the Sellers could be said to have actual knowledge of the accuracy of each of their representations and warranties.

- Anthem asserts that it "took time to uncover" the Sellers' alleged breaches.[68] But by its own admission, Anthem was in possession of the 2019 whistleblower report on which it based the fourth indemnification claim over eight months before the 2019 Release date.

In sum, in these circumstances, equity cannot save Anthem from its contractual bargain, and the fourth indemnification claim cannot amend or relate back to the first.

---

forfeiture, unless "the event is within the obligee's control or the circumstances indicate that he has assumed the risk," and noting that "the test is whether a particular interpretation would have avoided the risk of forfeiture viewed as of that time, not whether it will avoid actual forfeiture in the resolution of a dispute that has arisen later"). Applied to this dispute, Anthem assumed the risk that it would forfeit the escrowed funds if it failed to assert indemnification claims above the materiality threshold prior to each release date.

[65] HealthSun Defs.' Ans. Br. at 48–50.

[66] *See* HealthSun Pl.'s Reply Br. at 28–29.

[67] HealthSun Defs.' Ans. Br. at 50–51.

[68] *Id.* at 38–39.

## 2. Anthem was required to meet the materiality standard in order to block the release of the Disputed Funds.

Having determined that Anthem may not rely on its fourth claim to justify the continued withholding of the Disputed Funds, this decision now turns to the second issue—whether Anthem was required to reach the Section 10.2(a) materiality standard in order to block the release of the Disputed Funds.

Anthem argues that the materiality standard of Section 10.2(a) applies solely to its right to obtain indemnification and not to its right to block the release of escrow funds. Anthem relies on the lack of any materiality standard in Section 4, which provides that "Buyer may deliver one or more written notices at any time . . . prior to the distribution of all of the Escrow Funds . . . stating that it has made a claim for indemnification pursuant to, and in accordance with, Section 10.3 of the Purchase Agreement."[69] Anthem further roots this interpretation in Section 10.2(a)'s inclusion of the phrase "the cumulative amount of all Losses," arguing based on the word "cumulative" that losses should be permitted accumulate across escrow release dates such that losses totaling less than the materiality standard can block escrow distributions in the amount of those losses.[70]

Anthem's argument that Section 4 operates independently from Section 10.2(a) is inconsistent with the plain language of the parties' contractual

---

[69] Escrow Agreement § 4.

[70] Pasteur Defs.' Ans. Br. at 30–31.

24

scheme, although a connect-the-dots exercise is required to make this point. The starting point is Section 4 itself, which refers back to the Purchase Agreement. In the clause immediately preceding the portion of Section 4 quoted by Anthem, the Escrow Agreement provides that "[i]n the event Buyer has made a timely claim for indemnification *under Section 10.3* of the Purchase Agreement . . . , Buyer may deliver one or more written notices at any time."[71] Section 10.3 then provides that it is "[s]ubject to the provisions set forth *in this Article 10*," which includes the limitations of Section 10.2(a).[72] Next, the first sentence of Section 10.2(a) provides that the Sellers need only indemnify the Buyer "with respect to *any breach or inaccuracy*."[73] The third sentence of Section 10.2(a) provides that "*for purposes of determining whether there has been a breach or inaccuracy*" of the Specified Representations, the materiality standard of that sentence applies.[74]

Putting it all together, Section 4 is invoked only upon a valid indemnification claim made pursuant to Section 10.3 of the Purchase Agreement, which is subject to the limitations of Section 10.2 of the Purchase Agreement. Section 10.2(a) limits indemnification obligations to losses incurred with respect to breaches or inaccuracies, and the third sentence of Section 10.2(a) establishes what constitutes a

---

[71] Escrow Agreement § 4 (emphasis added).

[72] Purchase Agreement § 10.3 (emphasis added).

[73] *Id.* § 10.2(a) (emphasis added).

[74] *Id.* (emphasis added).

25

breach or inaccuracy for the purposes of the Specified Representations.[75] So, Anthem is able to block escrow distributions under Section 4 only to the extent that it has asserted valid indemnification claims within the limits of Section 10 of the Purchase Agreement.

Anthem's interpretation of "the cumulative amount of all Losses" language in Section 10.2(a) runs contrary to the contractual scheme as a whole. It is true that the purpose of the escrow fund is to secure the Buyer's indemnification claims, but the parties agreed upon four "automatic" release dates that would deplete the Buyer's security over time. That is, the Buyer assumed the risk that a late-arising indemnification claim might not be fully secured due to the automatic release of funds that preceded such a claim. While the Sellers bear the upfront risk of losing $100 million of the purchase price, the Buyer risks annually decreasing coverage for losses it incurs as a result of breaches of the Sellers' representations and warranties. This sort of contractual scheme reflects a form of risk-shifting common in purchase agreements. The word "cumulative" does not present a basis for rewriting this scheme.

To avoid this conclusion, Anthem argues that Plaintiffs' interpretation means "individual claims of less than $14,675,000 would be lost for each distribution

---

[75] *See id.* (noting that the remaining text of Section 10.2(a) applies "for purposes of determining whether there has been a breach or inaccuracy" of the Specified Representations).

26

period for not exceeding the materiality threshold."[76]  But claims that do not meet the Section 10.2(a) materiality standard are not lost; they are just insufficient to block scheduled disbursements of escrow funds and are thus secured by a lesser amount. Should Anthem's claims fail to meet the limiting language of Section 10.2(a), they can continue to accumulate beyond each release date, but the funds available to secure those claims will continue to deplete in accordance with the parties' contractual scheme.

### 3.  The language of the materiality standard is ambiguous.

To recap, Anthem's fourth claim cannot relate back and retroactively apply to block the release of the Disputed Funds, and Anthem must comply with the limitations of Section 10.2(a) in order to notice claims against escrow. It thus seems that analysis of the meaning of Section 10.2(a) is unavoidable, and the dispositive question has become:  Without the now-defunct third indemnification claim and the untimely fourth claim, do Anthem's first and second claim notices totaling $5.8 million meet the requirements of Section 10.2(a)?  The parties offer competing interpretations of Section 10.2(a) resulting in different answers to that question.

Generally speaking, "there are bound to be some minor mistakes or misstatements in [a seller's] representations and warranties," and most sellers are of the mind that they "should not suffer any indemnification burden until these

---

[76] Pasteur Defs.' Ans. Br. at 30–31.

27

problems exceed a certain amount."[77]   "To avoid being bothered with relatively minor indemnification claims," a seller will often negotiate for limitations on indemnification, such as materiality qualifiers.[78]   In this case, Section 10.2(a) contains the agreed-upon limitations on indemnification, including the disputed materiality standard.

To a layperson, Section 10.2(a) is much like a poem written in one of Tolkien's constructed languages—only a few persons dwelling outside of Middle-earth are conversant enough to understand its meaning.  To translate Section 10.2(a) for those dwelling outside of the deal room, a lexicon of terms used by transactional designers is helpful.

The first useful concept is "basket," which refers to a requirement that "losses exceed a threshold amount before the buyer is entitled to recovery for such losses."[79] There are two varieties of baskets relevant to this case.  There are "tipping baskets," also sometimes called "claim thresholds," which "provide[] for recovery of losses that were counted toward the threshold, as well as losses in excess of such threshold."[80]   A tipping basket or threshold requirement makes the sellers

---

[77] *See* Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 15.03[1] (2019 ed.).

[78] Stephen I. Glover et al., *M&A Practice Guide* § 14.04[1] (2020 ed.); *see also* Kling & Nugent, *supra* note 77, § 15.03[1].

[79] Glover et al., *supra* note 78 § 14.04[1].

[80] *Id.*

responsible for losses back to the "first dollar."[81]   There are also "deductible baskets," which "provide[] for recovery of losses only in excess of the stated threshold."[82]  Both kinds of baskets can apply "per-claim" or in the aggregate.

The second useful term is "materiality scrape," which comes into play because baskets can be viewed as imposing materiality qualifiers on indemnification claims.[83]   In this way, a basket threshold or deductible amount subjects indemnification claims to two layers of materiality qualifiers—the first in the representations and warranties and the second in the indemnification limitation.  To undo this "double materiality" problem, transactional designers use "materiality scrapes," or terms providing that the "materiality qualifiers in the representations and warranties will be disregarded for purposes of determining whether a representation or warranty has been breached or the amount of losses resulting from such breach, or both, with respect to indemnification obligations."[84]

Employing this lexicon here, Section 10.2(a) can be broken down as follows.

The first sentence of Section 10.2(a) (the "First Sentence") creates a deductible basket (the "Deductible") of $9.75 million in the aggregate for claims of breaches or inaccuracies in garden-variety representations:

---

[81] *Id.*

[82] *Id.*

[83] *Id.* § 14.04[3].

[84] *Id.*

29

> After the Closing, the [Sellers] . . . shall only be required to indemnify the Buyer and Indemnified Parties with respect to any breach or inaccuracy . . . exceed[ing] $9,750,000 (the "Deductible") . . . .[85]

The Deductible of $9.75 million applies in the *aggregate* to indemnification claims as to breaches and inaccuracies in the applicable representations and warranties. Elsewhere, the Purchase Agreement creates a "Per Claim Basket" requirement of $50 thousand for *individual* indemnification claims.

The First Sentence applies only to breaches or inaccuracies in garden-variety representations and warranties. It does not apply to indemnification claims as to the Specified Representations, as indicated by the following proviso included immediately after the above passage: "[P]rovided, however, that the limitations . . . shall not apply to . . . any breaches or inaccuracies of the . . . [representations including the Specified Representations] . . . ."[86]

The second sentence of Section 10.2(a) (the "Second Sentence") scrapes the materiality qualifiers from the representations to which the Deductible applies (the "Materiality Scrape") and replaces them as follows:

> [F]or purposes of
>
> (A) determining whether there has been a breach or inaccuracy of any representation, warranty, covenant or agreement subject to indemnification pursuant to this

---

[85] Purchase Agreement § 10.2(a).

[86] *Id.* (emphasis omitted).

30

Article 10 (other than [certain representations including the Specified Representations]), and

(B) calculating the amount of Losses with respect thereto,

the Per Claim Basket and the Deductible shall be the materiality standards for all purposes hereunder and, therefore, such representations, warranties and covenants alleged to have been breached shall be construed as if any qualification or limitation with respect to materiality, whether by reference to the terms "material," "in all material respects," "in any material respect," "Material Adverse Effect" or similar words, were omitted from the text of such representations, warranties, covenants and agreements.[87]

Put differently, the Second Sentence applies the $50 thousand Per-Claim Basket to determine whether any misstated garden-variety representations constitute a breach and the $9.75 million Deductible to calculate the aggregate loss required to obtain indemnification for those breaches. The Second Sentence applies only to indemnification claims subject to the Deductible. It does not apply to the Specified Representations as noted by the parenthetical statement beginning with "other than" found in part (A) above.

The parties' dispute centers on the third and last sentence of Section 10.2(a) (the "Third Sentence"), which establishes the limitations on indemnification for

---

[87] *Id.* (formatting altered). The Per-Claim basket is defined in Section 10.2(b) as claim threshold or tipping basket of $50 thousand for any individual indemnification claim. *See id.* § 10.2(b).

breaches and inaccuracies in the Specified Representations. The Third Sentence

provides:

> [F]or purposes of determining whether there has been a breach or inaccuracy of any of the representations or warranties set forth in [the Specified Representations], if and after the cumulative amount of all Losses sustained, incurred or suffered by any of the Buyer Indemnified Parties incident to, resulting from or in any way arising out of or in connection with any and all breaches or inaccuracies of the [Specified Representations] that would be incurred if clause (A) of the immediately preceding sentence applied notwithstanding the parenthetical therein that excludes breaches or inaccuracies of the [Specified Representations] equals or exceeds $14,675,000 in the aggregate, then
>
> (i) clause (A) of the preceding sentence shall apply to breaches and inaccuracies of the [Specified Representations] notwithstanding the parenthetical therein that excludes breaches or inaccuracies of the [representations including the Specified Representations] and all such Losses shall be deemed to have satisfied any and all instances of the terms "material," "in all material respects," "in any material respect," "Material Adverse Effect" (but not for any other determination of whether a Material Adverse Effect has occurred or is occurring with respect to this Agreement) or similar words set forth in any such [Specified Representations] and
>
> (ii) for the avoidance of doubt, all such Losses shall be calculated and indemnifiable in accordance with clause (B) of the immediately preceding sentence.[88]

---

[88] Purchase Agreement § 10.2(a) (formatting altered).

Anthem interprets the Third Sentence as imposing a buyer-friendly presumption of materiality as to claims totaling $14.675 million in the aggregate and not a deductible or threshold that Defendants must exceed to obtain indemnification. Anthem observes that often parties will agree to a deductible *and* a materiality scrape for the same claims and at the same number, as the parties to the Purchase Agreement did in the first two sentences of Section 10.2(a) with respect to garden-variety representations and warranties.[89] In those circumstances, the deductible protects the sellers against liability under a specified amount of loss, and the materiality scrape protects the buyer against having to prove materiality at the same number. According to Anthem, the Third Sentence is the materiality scrape without the deductible and is thus a purely buyer-friendly construct.

Anthem bases its interpretation on two aspects of Section 10.2(a). First, it observes that the Deductible of the First Sentence carves out the Specified Representations. Second, Anthem points to the language in the Third Sentence that "all such Losses shall be deemed to have satisfied any and all instances of the terms 'material.'"[90] To Anthem, "shall be deemed to have satisfied" creates a presumption in its favor that claims for losses in the aggregate amount of $14.675 million are material; it does not foreclose Anthem from pursuing claims for indemnification

---

[89] HealthSun Defs.' Ans. Br. at 27 (citing Glover et al., *supra* note 78 § 14.03).

[90] *Id.* at 28 (quoting Purchase Agreement § 10.2(a)).

below that amount if it can prove materiality. Anthem says that this interpretation is consistent with "the contract language permitting Anthem to make indemnity claims when it does not yet know with specificity the amount of losses arising from its indemnity claim."[91]

Plaintiffs offer a different interpretation of the Third Sentence. They view the Third Sentence as adopting, with respect to the Specified Representations, the basket and materiality scrape structure of the first two sentences, but with two modifications. The first modification is that subsection (i) of the Third Sentence swaps out the language of subsection (A) of the Second Sentence, thereby replacing the Deductible ($9.75 million) level with a higher ($14.675 million) level. The second modification is that subsection (ii), which refers to "all such Losses," renders the basket a tipping basket as opposed to the deductible basket. In other words, as to Specified Representations, Anthem must hit a higher materiality threshold but can be indemnified for a greater amount (back to the first dollar of losses) if it does.

Although the court finds Plaintiffs' interpretation of the Third Sentence more compelling, it is hard to conclude that Anthem's interpretation is unreasonable. Because the parties have both put forth reasonable interpretations of Section 10.2(a), the court finds the provision ambiguous as a matter of law. Further fact-finding as

---

[91] *Id.* at 30; *see also* Escrow Agreement § 4 (allowing Buyer to specify "the amount of the Loss if known, and, if not known, Buyer's reasonable good faith estimate of the amount of the Loss").

34

to Section 10.2(a)'s meaning and effect is appropriate and necessary to determine what the parties intended when drafting this provision.[92]

Plaintiffs foresaw the possibility of this outcome and request that, if the court declines to order the release of the entirety of the Disputed Funds, the court order the release of the difference between the amount of the Disputed Funds and the losses claimed in the first and second indemnification claims. At most, those losses are $5.8 million.[93] Ordering the release of funds that Anthem no longer has a basis for withholding is consistent with past decisions of this court and an appropriate outcome here.[94] Pursuant to Section 6(e) of the Escrow Agreement, Anthem must

---

[92] *See, e.g., Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 822 (Del. 1992).

[93] The Pasteur Plaintiff disputes the $5.8 million figure, arguing that the maximum amount of the first and second indemnification claims "do[es] not exceed $4.8 million." Pasteur Pl.'s Reply Br. at 30. The Pasteur Plaintiff bases this on a quote in the fourth claim that code deletions relating to the first claim resulted "in a premium recoupment from CMS of over $4,000,000." Fourth Indemnification Claim at 3. But the fourth claim notes that Anthem's losses to date had already exceeded $4 million, not that it anticipated a reduction in its initial estimate. At oral argument, Anthem estimated losses for these two claims as "at least 5.8 to 6.4" million dollars. Pasteur Action Dkt. 41, Tr. of Oral Arg. of Pl.'s Mot. for Partial Summ. J. at 57:19–22. This decision holds Anthem to its estimate in its first two claims for indemnification and notes that the outstanding loss estimate for claims that were timely as to the 2019 Release is $5.8 million.

[94] *See Hill v. LW Buyer, LLC*, 2019 WL 3492165, at *12 (Del. Ch. July 31, 2019) (ordering release of escrow funds that were withheld based on since-mooted claims for indemnification because the buyer "elected to insert a placeholder for later claims, rather than assert a defense"); *see also Julius v. Accurus Aerospace Corp.*, 2019 WL 5681610, at *15 (Del. Ch. Oct. 31, 2019) (holding that a buyer properly withheld funds but compelling release of those funds upon disposition of the underlying claim because "escrowed funds not subject to a pending or unresolved claim for indemnification were required to be disbursed to Sellers").

consent to deliver a joint instruction to the Escrow Agent to release the excess Disputed Funds.

### B. Contractual Fee-Shifting

Plaintiffs seek recovery of the legal fees they incurred in connection with their claims for specific performance pursuant to Section 10.4 of the Purchase Agreement.[95] Although Section 10.4 does not impose a prevailing-party requirement and thus permits the Sellers to recover fees on a claim-by-claim basis, aspects of Plaintiffs' claim for specific performance are unresolved. It thus seems more efficient to leave Plaintiffs' claims for contractual fee-shifting for the conclusion of this litigation. The motions are denied as to the Plaintiffs' respective claims for fee-shifting.

## III. CONCLUSION

The Pasteur Plaintiffs' motion for partial summary judgment as to Count One of its complaint is GRANTED in part and DENIED in part. The HealthSun Plaintiff's motion for judgment on the pleadings as to Count I of its complaint is GRANTED in part and DENIED in part. Plaintiffs' motions as to the claims for fee-shifting are DENIED.

---

[95] Purchase Agreement § 10.4 (providing for indemnification of losses "incurred or suffered by [Sellers] incident to, resulting from or in any way arising out of or in connection with any breach . . . of any covenant or agreement applicable to Buyer contained in or pursuant to this Agreement or in any Related Agreement").

36